# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| LOW TIDE BREWING, LLC,           ) | |
|                         ) | |
|         Plaintiff,         ) | |
|                         ) | No. 2:21-cv-0775-DCN |
|         vs.             ) | |
|                         ) | **ORDER** |
| TIDELAND MANAGEMENT LLC and   ) | |
| HUNTER EISELE,             ) | |
|                         ) | |
|         Defendants.       ) | |
| _____ ) | |

The following matter comes before the court on plaintiff Low Tide Brewing, LLC's ("Low Tide") motion for preliminary injunction, ECF No. 6. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND

This is a trademark dispute between two local breweries that produce, sell, and distribute craft beer.[1] Low Tide opened its brewery and taproom on Johns Island in March 2016. Prior to opening, Low Tide's owner, Michael Fielding ("Fielding") registered the domain name, lowtidebrewing.com, and established Low Tide as a limited liability company with the South Carolina Secretary of State. Shortly thereafter, in 2016, Low Tide registered the word mark LOW TIDE BREWING with the United States Patent and Trademark Office ("USPTO"). Low Tide has also federally registered the

---

[1] The Brewers Association for Small and Independent Craft Brewers defines a "craft brewer" as an outfit that annually produces less than six million barrels of beer and is independently owned, meaning that less than 25% of the business is owned by an industry member that is not itself a craft brewer. ECF No. 12-17 (citing Craft Brewer Definition, Brewers Association, https://www.brewersassociation.org/statistics-and-data/craft-brewer-definition/ (last accessed April 5, 2021)).

word mark TIDE CHASER to denote a particular beer that it brews and the following

trademark logos:

 

Additionally, Low Tide claims ownership of several other nonregistered word marks

containing the words "tide" and "tidal"—for example, TIDAL BRAU and WEIZEN

TIDE—as the names of various Low Tide beers.

Defendant Tideland Management LLC ("Tideland") is a South Carolina limited

liability company established in August 2019 that began operating as a craft brewery and

taproom in North Charleston in March 2021 under the name "Tideland Brewing."

Tideland is owned and operated by defendant Hunter Eisele ("Eisele") (together with

Tideland, "defendants"). Because of both men's presence in the local craft beer industry,

Eisele and Fielding have been familiar with one another for some time. Before either

opened his own brewery, Eisele considered the name "Low Tide" for his first brewery.

Unbeknownst to Eisele, Fielding had already selected "Low Tide" for the name of his

brewery and registered the "Low Tide" domain name. After noticing that the "Low

Tide" domain name had been registered, Eisele abandoned it and settled for the name

"Twisted Cypress." In 2017, Eisele opened Twisted Cyprus Brewing Company

("Twisted Cypress"), which operated in Charleston until its closure in 2019. Eisele

began working on the Tideland project shortly thereafter.

2

The parties offer differing accounts of the events leading up to the filing of this lawsuit. According to Low Tide, in February 2020 Eisele visited Low Tide's taproom where he encountered "two Low Tide representatives" and "volunteered to both representatives that he was considering ["Tideland Brewing"] for his new brewery's name, going so far as to ask one Low Tide representative what Low Tide's ownership team would think about his proposed name." ECF No. 6-1 at 6. Low Tide claims that its "co-owner who discussed ["Tideland Brewing"] with [] Eisele suggested to him that he choose an alternative name . . . ." Id. Eisele acknowledges discussing his new brewery plans at Low Tide's taproom but gives a different account of his conversation with Low Tide employees: "[A Low Tide employee] asked what my plans [we]re in reference to the name . . . . I told him that we'd selected Tideland Brewing. I certainly don't believe I asked if [Low Tide's owners] would have a problem with it." ECF No. 12-20, Eisele Decl. ¶¶ 9–12. And Eisele claims the encounter happened "much earlier" than February. Id. ¶ 10. In a second interaction between Eisele and Low Tide, which both parties agree occurred in February 2020, Eisele and a business partner visited Low Tide to look at some brewing equipment. According to Eisele, a Low Tide employee asked if Eisele had received a cease-and-desist letter from Low Tide related to Eisele's use of the name "Tideland Brewing." When Eisele stated that he had not, the employee "sort of shrugged it off, stating that if [Eisele] hadn't heard anything then maybe [Fielding] had gotten over it." Id. ¶ 8.

The parties did not discuss defendants' plan to use the name "Tideland Brewing" thereafter until October 2020, when defendants announced the opening of Tideland Brewing from Twisted Cypress's Facebook page. Shortly thereafter, Low Tide sent

defendants a cease-and-desist letter, which spurred attempts to resolve the dispute without resort to litigation.  When those attempts failed, Low Tide filed this action on March 18, 2021, asserting claims for (1) federal trademark infringement, (2) federal unfair competition and false designation of origin, (3) violation of the South Carolina Deceptive Trade Practices Act, (4) common law unfair competition, and (5) common law trademark infringement.  ECF No. 1, Compl.  The same day, Low Tide filed the instant motion for a preliminary injunction.  ECF No. 6.  On March 31, 2021, defendants responded in opposition, ECF No. 12, and on April 7, 2021, Low Tide replied, ECF No. 22.  The court held a hearing on the motion on April 8, 2021.  Thus, the motion has been fully briefed and is now ripe for the court's review.

## II.  STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "To obtain a preliminary injunction under the Winter test, a movant must make a 'clear showing' of [the] four requirements."  Alkebulanyahh v. Nettles, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011); see also Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction . . . must clearly show that it is

4

likely to succeed on the merits.") (internal quotation marks omitted).  As the Supreme

Court has noted, a preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555

U.S. at 22.

### III.  DISCUSSION

Low Tide seeks a prohibitory injunction to maintain the status quo until this

action can be resolved on its merits.[2]  Specifically, Low Tide asks that the court enjoin

defendants "from continuing to infringe upon and violating Low Tide's distinctive and

well-known trademarks."  ECF No. 6-1 at 1.  For such an injunction to issue, Low Tide

must make a clear showing as to each of prong of the Winter test.  The court discusses

each prong in turn.

#### 1. Likelihood of Success on the Merits

Low Tide bases its injunction request on its claims of trademark infringement and

unfair competition.  Therefore, for an injunction to issue, it must make a clear showing

---

[2] "Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending."  Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013).  The Fourth Circuit has defined "status quo" in this context as "the last uncontested status between the parties which preceded the controversy."  Id. at 320.  "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante."  Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012) (internal quotation marks and citation omitted); see also League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014) (finding that a motion to enjoin a law's "elimination of [same-day registration], out-of-precinct provisional voting, [ ] preregistration[, and] its cutback of early voting" was "the language and stuff of a prohibitory injunction seeking to maintain the status quo").  Defendants do not dispute that the injunction Low Tide seeks is prohibitory, and the court agrees.  It seems clear that the "last uncontested status" between Low Tide and defendants was just before defendants began using the TIDELAND mark in an allegedly infringing manner.  Thus, Low Tide's motion seeks to maintain the status quo and thus constitutes a request for a prohibitory injunction.

that it is likely to succeed on the merits of those claims.  See Winter, 555 U.S. at 20.

"Although [the likelihood-of-success] inquiry requires [a plaintiff] . . . to make a clear

showing that [it is] likely to succeed at trial, [the plaintiff] need not show a certainty of

success."  Pashby, 709 F.3d. at 321 (internal citations omitted).  To succeed in a

trademark infringement action under the Lanham Act,[3] a plaintiff must establish:

> (1) that it owns a valid mark; (2) that the defendant used the mark in
> commerce and without plaintiff's authorization; (3) that the defendant used
> the mark (or an imitation of it) in connection with the sale, offering for sale,
> distribution, or advertising of goods or services; and (4) that the defendant's
> use of the mark is likely to confuse customers.

Rosetta Stone, Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012); see also 15 U.S.C.

§ 1114(1)(a).  The court addresses each element in turn.

### a. Valid Trademark

Low Tide has federally registered two words marks, LOW TIDE BREWING and

TIDE CHASER, as well as two logo marks with the USPTO.  Low Tide also claims

rights to a bevy of other TIDE-related marks, although it has not applied for federal

registration of those marks.  "In general, the party claiming ownership of a mark must be

the first to use the mark in the sale of goods."  George & Co. LLC v. Imagination Entm't

Ltd., 575 F.3d 383, 400 (4th Cir. 2009) (citing 2 McCarthy on Trademarks and Unfair

Competition § 16:1 (5th ed.)).  When parties compete for the legal use of the same or

similar mark, "the rule of priority is that ownership and priority of a trademark go to the

---

[3] Here, the court employs law applicable to a federal trademark infringement
action under the Lanham Act.  Because "the elements of common law unfair competition
and trademark infringement under South Carolina law are identical to the elements for
proving a Lanham Act claim," federal trademark infringement law applies with equal
force to common law infringement and unfair competition claims.  Scurmont LLC v.
Firehouse Rest. Grp., Inc., 2010 WL 11433199, at *7 (D.S.C. May 19, 2010).

party who was first-to-use." 2 McCarthy on Trademarks and Unfair Competition § 16:1.50 (5th ed.)). As the Fourth Circuit explained,

> so long as a person is the first to use a particular mark to identify his goods in a given market, and so long as that owner continues to make use of the mark, he is 'entitled to prevent others from using the mark to describe their own goods' in that market.

George & Co., 575 F.3d at 400.

A party's registration of a mark with the USPTO is "prima facie evidence of the validity of the registered mark, . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration . . . ." 15 U.S.C. § 1115(a). "Registration grants a presumption of ownership, dating ownership to the filing date of the federal registration application, and the party challenging the registrant's ownership must overcome this presumption by a preponderance of the evidence." George & Co., 575 F.3d at 400 n.15. Low Tide has presented evidence that it has four federally registered trademarks. Further, Low Tide has presented evidence that it began using both its federally registered and unregistered marks as early as 2015 and prior to defendants' use of the TIDELAND mark in commerce. Defendants do not dispute that Low Tide is the owner of its claimed marks. As such, Low Tide has proven to the court that it has valid, protectable marks and thus demonstrated a likelihood of success with respect to the first element of its infringement claim.

### b. Use of the Mark in Commerce for the Sale or Advertising of Goods or Services without Consent

The next two elements of its infringement claim require Low Tide to demonstrate that defendants "used the mark (or an imitation of it) in commerce [and] 'in connection

with the sale, offering for sale, distribution, or advertising' of goods or services." <u>Rosetta</u> <u>Stone</u>, 676 F.3d at 152 (citing 15 U.S.C. § 1114(a)). Defendants do not dispute that they have used the TIDELAND mark in commerce for the purpose of selling and advertising their beer and taproom services, and that they have done so without Low Tide's consent.[4] Indeed, the evidence bears out as much. Therefore, Low Tide has demonstrated a clear likelihood of success with respect to the second and third elements of its infringement claim.

### c. Likelihood of Consumer Confusion

Finally, Low Tide must clearly demonstrate that defendants' use of the TIDELAND mark is likely to confuse consumers, often the most hotly contested issue of a trademark infringement claim and the most difficult to prove. "A likelihood of confusion exists 'if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" <u>George &</u> <u>Co.</u>, 575 F.3d at 393 (quoting <u>CareFirst of Md., Inc v. First Care, P.C.</u>, 434 F.3d 263, 267 (4th Cir. 2006)). "The ultimate question, for purposes of determining liability in trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." <u>Perini Corp. v. Perini Const., Inc.</u>, 915 F.2d 121, 127 (4th Cir. 1990) (internal quotations omitted). Consumer confusion can be found "by presumption based upon intentional copying." <u>Augusta Nat., Inc. v. Exec. Golf Mgmt.,</u> <u>Inc.</u>, 996 F. Supp. 492, 497 (D.S.C. 1998) (citing <u>Osem Food Industries, Ltd. v.</u>

---

[4] Although defendants claim that Low Tide employees indicated that Fielding had "gotten over it," they do not argue in their response that they obtained Low Tide's consent to use the mark. Eisele Decl. ¶¶ 9–12.

Sherwood Foods, Inc., 917 F.2d 161, 165 n.8 (4th Cir. 1990)).  Alternatively, the Fourth

Circuit has put forth the following nine factors for courts to consider in determining

whether there is a likelihood of confusion:

> (1) the strength and distinctiveness of the plaintiff's mark as actually used
> in the marketplace; (2) the similarity of the two marks to consumers; (3) the
> similarity of the goods or services that the marks identify; (4) the similarity
> of the facilities used by the markholders; (5) the similarity of advertising
> used by the markholders; (6) the defendant's intent; (7) actual confusion;
> (8) the quality of the defendant's product; and (9) the sophistication of the
> consuming public.

Rosetta Stone, 676 F.3d at 153.  "Not all of these factors are of equal importance, 'nor are

they always relevant in any given case.'"  George & Co., 575 F.3d at 393 (quoting

Anhueser-Busch, Inc. v. L&L Wings, Inc., 962 F.2d 316, 320 (4th Cir. 1992)); see also

Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 804 (4th Cir. 2001) ("The

importance and relevance of each factor will, of course, vary from case to case.").

As an initial matter, the court dispels Low Tide's contention that it has presented

evidence of intentional copying.  To be sure, "evidence of intentional, direct copying

establishes a prima facie case" of consumer confusion.  M. Kramer Mfg. Co. v. Andrews,

783 F.2d 421, 449 (4th Cir. 1986).  Low Tide anchors its argument to two pieces of

evidence that it claims demonstrate intentional copying.  First, Eisele intimated that he

wished to use the LOW TIDE mark for his first brewery prior to Low Tide's opening but

ultimately decided on a different name.  And second, Eisele was aware of the LOW TIDE

mark when he opened Tideland Brewing and even allegedly asked (and was denied)

permission to use the TIDELAND mark.  But evidence that a party intended to use a

trademark similar to an existing trademark is not the kind of intentional copying the law

contemplates.  Instead, the law is concerned with intentional copying where the intent is

"to appropriate some commercial advantage or benefit that [a] competitor derived from the use of the mark." Kramer, 783 F.2d at 449; see also Shakespeare Co. v. Silstar Corp. of Am., 110 F.3d 234, 241 (4th Cir. 1997) ("Our cases make clear [] that [the intentional copying] presumption arises only where the intentional copying is motivated by an intent to exploit the goodwill created by an already registered trademark.") (internal quotation marks omitted).

Neither circumstance to which Low Tide points indicates "intentional copying" of any legal significance.  Evidence that Eisele conceived of the name "Low Tide" for his own brewery prior to Low Tide's opening belies any notion that Eisele's use of the word "tide" is "motivated by an intent to exploit the goodwill" of his competitor.  Shakespeare, 110 F.3d at 241.  Obviously, one cannot steal the goodwill of a business that does not yet exist.  Further, as the court discusses in greater depth below, use of the word "tide" and derivations thereof in trademarks is commonplace in coastal communities.  Similarly, Eisele's knowledge of the LOW TIDE mark and subsequent decision to use a mark that includes the word "tide," without more, is not evidence of intentional copying.  Again, Low Tide's reliance stands bereft of any indication that Eisele's inclusion of a commercially prevalent word in his mark was motivated by an insidious plot to surf on Low Tide's earned goodwill.  Instead, reflecting the principle of Occam's razor, the evidence points to the simplest explanation: two men independently conceived of naming a coastal brewery "Low Tide."  Feilding beat Eisele to the punch, and now, years later, Eisele has also chosen a brewery name that incorporates the word "tide."  The court finds no evidence of intentional copying, meaning that Low Tide is not entitled to a presumption with respect to consumer confusion.  Because consumer confusion cannot be

presumed, the court turns to the <u>Rosetta Stone</u> factors to determine the likelihood that

consumer confusion with result from defendants' use of the TIDELAND mark.

### i. Strength of the Mark

"The strength of a mark is the degree to which a consumer in the relevant

population, upon encountering the mark, would associate the mark with a unique source."

<u>First Care</u>, 434 F.3d at 269.  This first <u>Rosetta Stone</u> factor "is 'paramount' in

determining the likelihood of confusion."  <u>Grayson O Co. v. Agadir Int'l LLC</u>, 856 F.3d

307, 314 (4th Cir. 2017) (quoting <u>Pizzeria Uno Corp. v. Temple</u>, 747 F.2d 1522, 1527

(4th Cir. 1984)).  "The 'strength' of the trademark is evaluated in terms of its conceptual

strength and commercial strength."  <u>Id.</u>  Courts should assess the conceptual "or inherent"

strength of a mark by focusing on its "linguistic or graphical 'peculiarity' [] considered in

relation to the product, service, or collective organization to which the mark attaches."

<u>Id.</u> (citing <u>Perini</u>, 915 F.2d at 124).  "[T]he frequency of prior use of [a mark's text] in

other marks, particularly in the same field of merchandise or service, illustrates the

mark's lack of conceptual strength."  <u>Id.</u> at 270 (internal quotes omitted).

"A mark's conceptual strength is determined in part by its placement into one of

four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4)

arbitrary or fanciful."  <u>George & Co.</u>, 575 F.3d at 394 (citing <u>Pizzeria Uno</u>, 747 F.2d at

1527.  "Fanciful marks, which are inherently distinctive, typically involve made-up

words created for the sole purpose of serving as a trademark," e.g., "Clorox®, Kodak®,

Polaroid®, and Exxon®," and "[a]rbitrary marks, which are also inherently distinctive,

typically involve common words that have no connection with the actual product, . . . so

the mark can be viewed as arbitrarily assigned."  <u>Id.</u> (citing <u>Sara Lee</u>, 81 F.3d at 464).

11

"Suggestive marks, which are also inherently distinctive, do not describe a product's features but merely suggests them.  In other words, the exercise of some imagination is required to associate a suggestive mark with the product," e.g. "Coppertone®, Orange Crush®, and Playboy®."  Id.

The parties provide little analysis regarding the inherent distinctiveness of Low Tide's mark.  Low Tide summarily states that "neither LOW nor TIDE is generic or descriptive when applied to beer and breweries, placing the marks into the suggestive or fanciful categories of the spectrum."  ECF No. 6-1 at 18 (internal quotation marks omitted).  Defendants, for the purpose of their response, assume the LOW TIDE mark is suggestive.  See ECF No. 12 at 10.  The court agrees with defendants, finding the mark to be suggestive of Low Tide's good and services, even if only vaguely so.  The law is clear that a suggestive mark "requires imagination, thought and perception to reach a conclusion as to the nature of goods."  Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 (2d Cir. 1976); see also George & Co., 575 F.3d at 394 ("[T]he exercise of some imagination is required to associate a suggestive mark with the product.").  The connection between the mark and the characteristic of the good or service it suggests can be faint and even require a cognitive leap.  See Fuel Clothing Co. v. Nike, Inc., 7 F. Supp. 3d 594, 611 (D.S.C. 2014) (finding "Fuel" suggestive of athletic wear); see also RFE Industries, Inc. v. SPM Corp., 105 F.3d 923, 926 (4th Cir.1997) (holding that the manufacturer's "Popcorn" trademark used to denote popcorn-shaped silver anodes used in electroplating was suggestive).  Of particular relevance here, the Supreme Court has stated in dicta that the mark "tide" is suggestive of laundry detergent.  Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 210 (2000).  Although the connection between the

12

word "tide" and laundry is faint, the former nevertheless connotes an aspect of washing clothes. Likewise, the court finds the LOW TIDE mark suggestive of a coastal brewery and taproom. The mark suggests elements of coastal living and relaxation and conjures aquatic imagery. All these characteristics can be said to apply to Low Tide's products and services. As such, the court finds the mark suggestive and therefore inherently distinctive.

But the court's discussion of the strength of the mark cannot end there. A mark's designation as suggestive "does not resolve the mark's conceptual strength." CareFirst, 434 F.3d at 270. The court must also consider "the frequency of prior use of a mark's text in other marks, particularly in the same field of merchandise or service," which, if significant, "illustrates the mark's lack of conceptual strength." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 662 (4th Cir. 2018) (quoting CareFirst, 434 F.3d at 270). "[C]onsumers are unlikely to associate a mark with a unique source if other parties use the mark extensively." Id. In short, "[a] strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." CareFirst, 434 F.3d at 270 (citing Universal Money Centers, Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1533 (10th Cir. 1994)).

The relevant marks, LOW TIDE and TIDELAND, share the word "tide," meaning that "tide" is the "contested portion of the mark" and thus the proper target of the court's analysis here. Choice Hotels Int'l, Inc. v. Zeal, LLC, 135 F. Supp. 3d 451, 464 (D.S.C. 2015) (evaluating the frequency with which "the contested portion of the mark has been used in other marks"). The frequency with which third parties have employed the word "tide" in trademarks—both within the brewing industry and outside of it—sinks Low

13

Tide's contention that its mark is conceptually strong. As defendants outline, several breweries and taphouses along the eastern seaboard use the word "tide" or derivations thereof in their marks. Of note, "Tidal Creek Brewhouse," "Two Tides Brewing," and "Riptide Brewing Company" operate as brewery/taprooms in Myrtle Beach, Savannah, and Naples, respectively. Tideland has presented evidence of eight other federally registered trademarks from breweries, taprooms, and beer products that incorporate the word "tide," and three more that remain pending. ECF No. 12 at 12; ECF No. 12-6. Commercial use of the word "tide" is even more common in the alcohol industry at large. Defendants note that over twenty federally registered and pending trademarks in the alcoholic beverage category contain the word "tide" and another seven contain the word "tidal." ECF No. 12 at 12; ECF No. 12-7. And still more instances of marks that employ "tide" exist in the category of "bar and/or restaurant services." Id. Outside of the relevant industry, the frequency with which businesses have employed the words "tide" and "tidal" is significant. Overall, Tideland has presented evidence of 664 trademark registrations that include the word "tide" and 136 that contain the word "tidal," for a total of 800 federally registered marks. These "tide"-utilizing marks represent only those which have been registered by their users; surely, the "the frequency of prior use" is even greater than those figures reflect. Variety Stores, 888 F.3d at 662. And the use of "tide" is especially prevalent, as one might imagine, in coastal states like South Carolina. See ECF No. 12-15 (demonstrating that searches of the Secretaries of State Offices of businesses that contain "tide" or "tidal" in their names generated over 600 records of businesses in South Carolina, over 800 in Georgia, and over 450 in North Carolina).

Low Tide attempts to whitewash the frequency with which the text of its mark has been employed by impermissibly narrowing the scope of the court's inquiry. It states, "While other breweries in the United States may have incorporated 'Tide' into their names, not a single South Carolina brewery, other than Low Tide, had done so until Defendants adopted the infringing TIDELAND BREWERY mark[.]" ECF No. 6-1 at 18. As an initial matter, the court notes that defendants have presented evidence that one such brewery, "Tidal Creek Brewhouse" in Myrtle Beach, South Carolina, has incorporated a variant of "tide" into its name. But even had it not, nothing in the law suggests that such a narrowing of the court's inquiry is appropriate. Courts do not limit the scope of the inquiry to businesses within the markholder's state. See, e.g., Grayson O, 856 F.3d at 316; Variety Stores, 888 F.3d at 663.[5] And the Fourth Circuit has specifically noted that marks within the relevant industry are "particularly" telling, implying that marks outside of it also provide meaningful analytical value. CareFirst, 434 F.3d at 270 ("The frequency of prior use of a mark's text in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength.") (emphasis added) (internal alterations and quotation marks omitted). In any event, the instances of third-party use of the word "tide," locally and within the relevant industry, are enough to

---

[5] Low Tide cites to vonRosenberg v. Lawrence to convince the court to limit the scope of its inquiry geographically. 412 F. Supp. 3d 612, 647 (D.S.C.), enforcement granted in part, 429 F. Supp. 3d 175 (D.S.C. 2019). But the court there narrowed its inquiry based on the relative complexity of the relevant mark. The court specifically noted, "This is not the case of a single word essentially comprising a mark repeatedly being used by third-parties." Id. (citing Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 94 (4th Cir. 1997) (finding a mark weak where the plaintiff had word "Petro" registered in fourteen marks and there was evidence of third-party registration of marks containing "Petro"). Well, this is precisely a "case of a single word essentially comprising a mark repeatedly being used by third-parties," meaning that vonRosenberg actually supports the court's rationale.

take the wind from Low Tide's sails. As such, Low Tide's endeavor to wash away the prevalence of the word "tide" in coastal commerce holds little water.

At bottom, the pervasiveness with which "tide" has been employed by coastal businesses—both inside and outside of the relevant industry—"illustrates the mark's lack of conceptual strength." <u>Variety Stores</u>, 888 F.3d at 662 (finding the use of the word "backyard" in 527 registered marks, nearly fifty of which were in the relevant industry, stripped a suggestive mark of its commercial strength); <u>see also</u> <u>Grayson O</u>, 856 F.3d at 315 (finding that "numerous instances of other uses of 450" in the haircare industry stripped a suggestive mark of its commercial strength). Therefore, the court finds the LOW TIDE mark to be conceptually weak.

Finding the mark conceptually weak, the court considers its commercial strength or "secondary meaning." In assessing commercial strength, a court "looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." <u>Id.</u> (internal quotes omitted). "Secondary meaning is the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." <u>Perini</u>, 915 F.2d at 125. The Fourth Circuit has relied on the following factors when considering the commercial strength, or "secondary meaning," of a mark: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." <u>Id.</u>

With respect to secondary meaning, Low Tide notes that it has a strong customer base, "has spent approximately $75,000 on paid advertising," has earned "over $6 million in revenue since 2016," and has been recognized with various awards related to its brewing, most of which are from local publications.  ECF No. 6-1 at 19.  None of these facts are particularly demonstrative of a secondary meaning sufficient to convince the court of the mark's strength.  For one, while the court recognizes that Low Tide is a wholly local operation, and a very successful one at that, its advertising expenditures and revenue are not indicative of secondary meaning.  See Grayson O Co. v. Agadir Int'l LLC, 2015 WL 7149935, at *6 (W.D.N.C. Nov. 13, 2015), aff'd, 856 F.3d 307 (4th Cir. 2017) (finding "$200,000 on advertising" in four years "minimal[ly] relevant" compared "to the overall hair care industry"); Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 405 F. Supp. 2d 680, 694 (E.D. Va. 2005), aff'd, 227 F. App'x 239 (4th Cir. 2007) (finding $360,000 of advertising expenditures per year and $12 million in profit unconvincing).  Craft beer is a $29.3-billion-a-year industry.  ECF No. 12-12.  Like the courts in Grayson and Renaissance Greeting Cards, the court finds that Low Tide's advertising expenditures and sales are relatively modest when compared to the industry as a whole.  The awards and recognitions Low Tide has garnered, while perhaps strong evidence of good-tasting beer, likewise is underwhelming with respect to secondary meaning.  George & Co., 575 F.3d at 396 (finding no secondary meaning despite the fact that the mark holder "enjoyed some unsolicited media attention").  Therefore, the court finds that Low Tide's conceptually weak mark is not buoyed by a secondary meaning.  Thus, Low Tide has failed to demonstrate that it has a strong mark, the "paramount" factor in likelihood-of-consumer-confusion analysis.  Grayson O, 856 F.3d at 314.

### ii. Similarity of the Marks

In determining whether marks are similar, courts "must examine the allegedly infringing use in the context in which it is seen by the ordinary customer." Anheuser-Busch, 962 F.2d at 319. "In assessing the similarity of the marks . . . we focus on the dominant portions of the parties' marks." George & Co., 575 F.3d at 396. The dominant portions of the marks at issue are LOW TIDE and TIDELAND, meaning that the court can dispense with consideration of the shared generic descriptor "brewing." Obviously, the two marks are not identical but share "tide" as a common word. Also self-evident, LOW TIDE is two separate words, while TIDELAND is a compound word. The court recognizes that the mark's shared use of the word "tide" renders them similar to some degree. But again, the court's analysis cannot stop there. "If one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks." CareFirst, 434 F.3d at 271. "This effect is most significant when, as here, the allegedly infringed mark . . . has little independent strength." Id. In other words, "if a mark is weak, use of a similar mark even on similar goods is unlikely to cause confusion if minor differences distinguish one party's mark from another." Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d 1136, 1151 (10th Cir. 2013). Such is the case here. As the court indicated above, TIDE is a particularly weak mark in the context of both coastal businesses and the alcohol industry. Therefore, the distinctions with which the similarity is paired warrants special consideration here. LOW TIDE contains the word "low" on the front end of "tide," and TIDELAND contains the word "land" on the back end of "tide." The court finds that these dissimilarities, which abut a weak mark, significantly lessen the similarly of the

marks.  As such, the marks are, at best, somewhat similar, meaning that Low Tide, now swimming upstream, has failed to demonstrate that the similarity-of-the-marks factor tilts the customer-confusion inquiry in its favor.

### iii.  Goods/Services Identified, Facilities Used, and Advertising

That the goods, services, and facilities of Low Tide and Tideland are similar cannot be in doubt.  Both offer nearly identical goods—craft beer and related merchandise—and identical services—taproom services.  And the evidence indicates that both parties operate in similar facilities twenty miles apart, with Low Tide located on Johns Island and Tideland in North Charleston.  As such, the second, third, and fourth Rosetta Stone factors weigh in favor of customer confusion.

### iv.  Defendant's Intent

"If there is intent to confuse the buying public, this is strong evidence establishing the likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion."  George & Co., 575 F.3d at 397 (quoting Pizzeria Uno, 747 F.2d at 1527).  As the court signaled above, Low Tide has presented no evidence that defendants intentionally copied its mark to deliberately appropriate goodwill.  The evidence, especially the marketplace prevalence of the word "tide," leads the court to conclude that defendants' use thereof was likely the result of coincidence rather than misappropriation.  Therefore, this factor weighs against consumer confusion.

### v.  Actual Confusion

"Actual confusion can be demonstrated by both anecdotal and survey evidence, but "[e]vidence of only a small number of instances of actual confusion may be dismissed

as de minimis." <u>George & Co.</u>, 575 F.3d at 398 (citing <u>Petro Stopping Centers, L.P. v. James River Petroleum, Inc.</u>, 130 F.3d 88, 95 (4th Cir. 1997) ("In light of [the plaintiff's] huge volume of commerce, [the plaintiff's] meager evidence of actual confusion is at best de minimis.")).  Low Tide has presented evidence of only one instance[6] of actual consumer confusion.  According to Low Tide, one of its former employees contacted Feilding to ask whether Tideland Brewing was a second location for Low Tide.  ECF No. 6-1 at 24.  For two reasons, the court declines to take the bait.  For one, "testimony of [a] [p]laintiff's employees and executives is fraught with bias and is not probative of consumer perception." <u>Worsham Sprinkler Co. v. Wes Worsham Fire Prot., LLC</u>, 419 F. Supp. 2d 861, 870 (E.D. Va. 2006) (citing <u>815 Tonawanda St. Corp. v. Fay's Drug Co.</u>, 842 F.2d 643, 648 (2d Cir. 1988)).  And second, a single instance of consumer confusion should be dismissed as de minimis. <u>See</u> <u>George & Co.</u>, 575 F.3d at 393.

        In response to its lack of evidence of actual confusion, Low Tide notes that "preliminary injunctions are inevitably based on an incomplete record," meaning that the court should not expect mountains of smoking-gun evidence.  Of course, Low Tide is correct.  However, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter</u>, 555 U.S. at 22.  In issuing a preliminary injunction, the court compels remedial action before adjudicating a dispute on the merits.  The court acknowledges Low Tide's point that the

---

        [6] In a related filing, a motion to expedite, Low Tide presented one other instance of actual confusion. <u>See</u> ECF No. 11 at 4.  Low Tide's evidence, though, is again scuttled by its unreliability.  As defendants noted in response, the allegedly confused consumer "is the ex-husband of the current girlfriend of" a party related to this action. ECF No. 21 at 1.  Therefore, the court declines to accord this purported instance of confusion any weight.

burden is steep, but the law has made it deliberately so. That Low Tide lacks evidence of actual confusion weighs against a likelihood of consumer confusion.[7]

In sum, the similarity of Low Tide and Tideland, including the goods and services each offers and the facilities in which each operates, indicates a possibility of consumer confusion. On the other hand, Low Tide's mark is a suggestive mark, whose inclusion of the commercially commonplace word "tide" renders it conceptually weak. And Low Tide has failed to demonstrate that the mark has obtained commercial strength, i.e., a secondary meaning. Further, the two marks are, at the very best, somewhat similar, weighing against consumer confusion. Additionally, the record contains no evidence that defendants intentionally copied Low Tide's mark, and the court has dismissed as de minimis the suspect evidence of actual consumer confusion in the record. On the day of the hearing, defendants submitted evidence that an examiner with the USPTO had recently reviewed their application to register the word mark TIDELAND BREWING. ECF No. 27. The examiner, after reviewing the mark against other federally registered marks, found "no conflicting marks." ECF No. 27-1 ¶ 4. While the examiner's finding does not bind the court, it certainly bolsters the court's conclusion that defendants' use of TIDELAND BREWING likely does not infringe upon Low Tide's marks. Thus, on balance, the court cannot conclude that the Rosetta Stone factors indicate a likelihood of

---

[7] In its analysis of the Rosetta Stone factors, the court omits inquiry into the eighth and ninth factors. With respect to the former, "[c]onsideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 467 (4th Cir. 1996). That is not the case here. And with respect to the latter, the sophistication of the consuming public may be instructive "when the relevant market is not the public-at-large." Id. That is also not the case here. As such, the court excludes these factors from consideration.

consumer confusion, a necessary element of Low Tide's infringement claim.  676 F.3d at 152.

As the court discussed at the outset, an injunction requires the movant to demonstrate, as the first requirement, a clear likelihood of success on the merits of its claim.  Winter, 555 U.S. at 20.  Low Tide seeks to enjoin defendants' commercial use of the word "tide."  But as the court has demonstrated, the law does not afford a markholder particularly robust protection for its use of a commercially pervasive word.  As such, the evidence Low Tide has presented does not instill in the court confidence that it would succeed on the merits of its infringement claim.  At this point, the court need not split hairs to definitively come down on either side; it is sufficient for the purposes of the requested injunction to determine that Low Tide has not made a clear showing of its likelihood to succeed on the merits of its trademark infringement claim.  Without that showing, Low Tide is up the creek.  See Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009) (holding that "all four requirements" under Winter "must be satisfied").  Accordingly, the court need not reach the remaining three prongs of the Winter test to find Low Tide's request for an injunction dead in the water.

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** the motion.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**April 12, 2021**
**Charleston, South Carolina**